HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
GREGORY R. MICHAEL (SBN: 306814)
gmichael@dhillonlaw.com
MICHAEL YODER (pro hac vice pending)
myoder@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

ROBERT DUNN (SBN: 275600)              RYAN J. WALSH (pro hac vice pending)
rdunn@eimerstahl.com                   rwalsh@eimerstahl.com
EIMER STAHL LLP                        JOHN K. ADAMS (pro hac vice pending)
99 South Almaden Blvd., Suite 662      jadams@eimerstahl.com
San Jose, CA 95113                     AMY C. MILLER (pro hac vice pending)
(669) 231-8755                         amiller@eimerstahl.com
                                       EIMER STAHL LLP
                                       10 East Doty Street, Suite 800
                                       Madison, WI 53703
                                       (608) 441-5798

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT FOR
## THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTHEW BRACH,** an individual; **JESSE PETRILLA,** an individual; **LACEE BEAULIEU,** an individual; **ERICA SEPHTON,** an individual; **KENNETH FLEMING,** an individual; **JOHN ZIEGLER,** an individual; **ALISON WALSH,** an individual; | Case No.: 2:20-cv-06472 DDP (AFMx) **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** Judge: Hon. Dean D. Pregerson |

1



First Amended Complaint                                    Case No. 2:20-cv-06472

1

2

3

4

5

6

**ROGER HACKETT,** an individual; **CHRISTINE RUIZ,** an individual; **Z.R.,** a minor; **MARIANNA BEMA,** an individual; **ASHLEY RAMIREZ,** an individual; **TIFFANY MITROWKE,** an individual; **ADE ONIBOKUN,** an individual; and **BRIAN HAWKINS,** an individual;

7

8

Plaintiffs,

v.

9

10

11

12

13

14

15

16

17

**GAVIN NEWSOM**, in his official capacity as the Governor of California; **XAVIER BECERRA**, in his official capacity as the Attorney General of California; **SONIA Y. ANGELL**, in her official capacity as the State Public Health Officer and Department of Public Health Director; and **TONY THURMOND**, in his official capacity as State Superintendent of Public Instruction and Director of Education

Defendants.

18

19

20

21

22

23

24

25

26

27

28

2



First Amended Complaint

Case No. 2:20-cv-06472

*Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is the principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.* – Chief Justice Earl Warren, *Brown v. Board of Education*, 347 U.S. 483, 491 (1954).

Plaintiffs Matthew Brach, Jesse Petrilla, Lacee Beaulieu, Erica Sephton, Kenneth Fleming, John Ziegler, Alison Walsh, Roger Hackett, Christine Ruiz, her minor child, referred to by his initials, Z.R., Marianna Bema, Ashley Ramirez, Tiffany Mitrowke, Ade Onibokun, and Brian Hawkins, by their attorneys, Dhillon Law Group, Inc., for their claims against Defendants Gavin Newsom, in his official capacity as the Governor of California; Xavier Becerra, in his official capacity as the Attorney General of California; Sonia Y. Angell, in her official capacity as the State Public Health Officer and Department of Public Health Director; Tony Thurmond, in his official capacity as State Superintendent of Public Instruction and Director of Education, allege and show the Court as follows (this "Complaint").

## NATURE OF ACTION

1.     Defendants have ushered in a new wave of COVID-19 restrictions, this time barring in-person schooling for most of California's children. In Defendants' rush to enact these new restrictions, they have placed special interests ahead of the wellbeing

3



First Amended Complaint

Case No. 2:20-cv-06472

of the children, and children's fundamental right to receive a basic minimum education. Defendants' arbitrary bar on in-person schooling effectively deprives Plaintiffs' children, and millions of other children across California, of the opportunity for a decent education and the attendant hope for a brighter future. The state's exclusion from in-person schooling also contradicts the recommendations of experts from across the political spectrum and across numerous disciplines, who argue that schools must re-open for in-person instruction this year to avoid further harm to California's children.

2.     This Action presents facial challenges to the Governor of California's May 4, 2020 Executive Order N-60-20 ("State Order"), attached here as **Exhibit 1**, which requires Californians to obey all State Public Health directives and orders, including the State's July 17, 2020 "COVID-19 Industry Guidance: School and School-Based Programs," attached here as **Exhibit 2**.

3.     This Action is brought pursuant to 42 U.S.C. § 1983, on the grounds that the State Order and associated guidance and directives, and Defendants' enforcement thereof, violate Plaintiffs' constitutionally and federally protected rights, including specifically: (1) the right to substantive due process (U.S. Const. amend. XIV); (2) the right to equal protection, free from arbitrary treatment by the State (U.S. Const. amend. XIV); (3) the right to be free from federally funded state action resulting in a disparate impact on racial minorities (Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d, *et seq.*); and (4) the right to equal and meaningful access to education, free from arbitrary state action resulting in a disparate impact on those with disabilities (Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*; Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131, *et seq.*; and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*)).

4.     With the school year commencing in a little over two weeks from the date of this filing, time is of the essence, and the Court should not hesitate to ensure that Plaintiffs' fundamental rights in securing a basic minimum education for their children are preserved and protected from Defendants' arbitrary actions.

4



First Amended Complaint                                    Case No. 2:20-cv-06472

**JURISDICTION AND VENUE**

5.     This action arises under 42 U.S.C. § 1983 in relation to Defendants' deprivation of Plaintiffs' rights as secured by the U.S. Constitution and federal law. Accordingly, this Court has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1343. This Court has authority to award the requested declaratory relief under 28 U.S.C. § 2201; the requested injunctive relief and damages under 28 U.S.C. § 1343(a); and attorneys' fees and costs under 42 U.S.C. § 1988.

6.     The Central District of California is the appropriate venue for this action pursuant to 28 U.S.C. §§ 1391(b)(1) and (2) because it is the District in which Defendants maintain offices, exercise their authority in their official capacities, and will enforce the State Order; and it is the District in which substantially all of the events giving rise to the claims occurred.

**PARTIES**

7.     Plaintiff Matthew Brach is a resident of Rancho Palos Verdes, California. He is suing in his individual capacity and not as an elected member of the Board of Education for the Palos Verdes Peninsula Unified School District. He is the father of two children. His sixteen-year-old son and thirteen-year-old daughter are students in the Palos Verdes Peninsula Unified School District. His son is entering his senior year and will suffer academically as a result of the denial of personal interaction with teachers and positive academic role models. His son's learning style requires him to be able to ask questions of and interact with his teachers and to learn collaboratively with peers. His daughter is already suffering emotionally from being isolated from her learning community.

8.     Plaintiff Jesse Petrilla is a resident of Mission Viejo, California. He has a son who is about to enter first grade. Last school year, when his son was in kindergarten and transitioned from in-classroom to distance learning, Petrilla noticed a significant decline in his son's discipline and engagement. His son's enthusiasm for learning declined, and his son became restless. Petrilla's wife has been forced to take time off



First Amended Complaint                                    Case No. 2:20-cv-06472

from work in order to oversee her son's education. The Petrillas are concerned about the negative effects that this prolonged absence from the social aspects of structured education will have on the future development of their son.

9.      Plaintiff Lacee Beaulieu is a resident of La Jolla, California. She has two children, a daughter who is entering the ninth grade at a private school and a son who is about to enter fifth grade in the San Diego Unified School District. One of her family's biggest challenges with distance learning was trying to balance screen time. Her son's doctor has recommended that he not spend more than two hours a day in front of computer screens. With distance learning, this instruction has been almost impossible to honor. She is concerned that if her son is going to keep up academically, this could come at a cost of brain development issues as a result of him spending too much time in front of computer screens. She found it unrealistic to expect her son to follow the daily/weekly schedule on his own. If she was tied up with work, her son was unable to proceed with his daily lesson plans. While her daughter had more interaction with her teachers, because of the lack of labs, she was unable to properly perform science experiments.  Beaulieu believes that the increased screen time has had a negative effect on both of her children. She has noticed that they have difficulty with sleep schedules, both are depressed, and their discipline in completing school assignments has decreased. The enforced deprivation of personal contact with their peers has also affected these children negatively.

10.     Plaintiff Erica Sephton is a resident of Murrieta, California. She has a daughter who is about to enter transitional kindergarten at Saint Jeanne de Lestonnac Catholic school in Temecula. Sephton understands that her daughter needs social interaction with her fellow classmates, something that she cannot get at home doing distance learning. Sephton is aware of the risks of COVID-19 and believes that these minor risks for children do not outweigh the harm that her daughter is suffering by being deprived of her in-person education. While the school, the teachers and the students are ready to resume school instruction in the classroom with proper

precautions, Sephton believes that they are being held back because of positive test results in other parts of the county and not because of any substantial risk in her community. She does not understand why her daughter is allowed to spend all day in a childcare facility, but cannot spend the same period of time in a private school, learning.

11.     Plaintiff Kenneth Fleming is the father of a public high school senior in Long Beach, California. His daughter has maintained straight A's on her report card for the last three years. She is a student athlete with ambition to earn a sports scholarship to attend her dream school.  Plaintiff Fleming is concerned that online-only education, which has not been awarding letter grades to students, adversely impacts his daughter's opportunity to compete for a college scholarship. He also believes that online-only education does not assist his daughter either athletically or academically in preparing for college.

12.     Plaintiff John Ziegler is a resident of Camarillo, California and is the father of an eight-year-old girl enrolled in public school. When her school moved from in-person instruction to an online platform during the Spring 2020 semester, her educational development suffered. She fell behind in her academic progress. As a result of the denial of in-person educational instruction, Plaintiff Ziegler's wife is left with no choice but to forgo her employment to stay home with their daughter.

13.     Plaintiff Alison Walsh is the mother of two children who were in the Capistrano Unified School District during the 2019-2020 school year. When CUSD moved to an online platform in the 2020 spring semester, her children's education suffered. Her children's school did not offer her children any live instruction. Their teachers merely sent work packets to the students to complete independently. In preparation for the 2020-2021 academic year, Plaintiff Walsh enrolled her children in private school to ensure that her children could receive academic instruction. Now with Defendants' guidance, even the private school is prohibited from providing in-person education.

First Amended Complaint                                                    Case No. 2:20-cv-06472

14.     Plaintiff Roger Hackett lives in Ventura County and has a son who will attend a private middle school in Westlake Village, California. His son's school has made significant preparations for safe in-person instruction pursuant to the CDC and local guidelines. This school is willing to offer both in-person and distance learning options based on the preference of the parents, and is ready to safely reopen in-school classes and non-contact athletics starting August 12. Plaintiff Hackett's concern is that online-only education will adversely impact his son's academic and social development. His son is frustrated by continual isolation from his academic community and absence from school athletics. Even though Westlake Village has very few COVID-19 positive cases, because it is in Los Angeles County, which is on the state's watch list, this private school is being prevented from operating in compliance with COVID safety guidelines and in accordance with the desires of the school, teachers, parents, and students.

15.     Plaintiff Christine Ruiz is Hispanic and lives in Los Angeles County. She has two sons who attend public school in the county, one of whom is Plaintiff Z. R., referred to by his initials herein. Both boys have been diagnosed with autism. Her 15-year-old son, Z. R., attends high school, in moderate to severe special education classes. Under normal circumstances, he has an entire team of special needs-educated, credentialed staff working hands-on with him during the entire school day pursuant to an Individual Education Program ("IEP") mandated by law. As of March 16, 2020, he has received none of the services required by his IEP. While the school offered a Zoom meeting, this did not work. Her younger son is in junior high school. He has been placed in mild to moderate special education classes. The online class only lasted about 30 minutes a day, and he did not learn anything by clicking a few links and watching a video. Her son is a hands-on learner. As a result of the school transitioning to online-only education and not providing the required IEP services, Ruiz has had to hire an educational tutor to assist her sons.

First Amended Complaint                                            Case No. 2:20-cv-06472

16.      Plaintiff Z. R. is a minor and, as such, is referred to by his initials herein. Z. R. is the 15-year-old son of Christine Ruiz who currently attends high school. Z. R. is Hispanic and takes moderate to severe special education classes as a result of his autism.

17.      Plaintiff Marianne Bema is a resident of Los Angeles County, California. She is originally from Cameroon, Africa and is a single mother of three school aged-sons. It is hard for her boys to pay attention and learn solely online. Even though she speaks several languages, there is a small language barrier and it is best for her children to be taught by a trained, English-speaking teacher. Plaintiff Bema also has spotty internet connection at her home, and has noted that the online classes are not secure, and were sometimes hacked into by third-parties.

18.      Plaintiff Ashley Ramirez has three children who attend their local public school.  Ramirez and one of her sons have both tested positive for COVID-19 and successfully recovered. Her children participate in the free or reduced lunch program at school, which greatly helps their family's financial situation.  Plaintiff Ramirez tries to limit screen time for her sons, and notes that the schools' distance learning scheme seems to be promoting unhealthy amounts of screen time. Her oldest son has an IEP and he basically "shut down" and cannot effectively participate in an online-only education. Plaintiff Ramirez wonders why the schools are not allowed to reopen, when day care and camps are open for children.

19.      Plaintiff Tiffany Mitrowke is a resident of San Diego, California. She is the single mother of a seven-year-old boy who attends public school. Her son has been negatively affected educationally and emotionally by the school closures. She hears her son crying in the shower because he cannot go to school and feels isolated. When her son's school went online, the teachers provided no meaningful instruction and merely sent homework packets to the students; additionally, no one from the school even called to check to see how her son was fairing. She has also reached out to the school with questions concerning the next school year but the school has been unresponsive.

9

First Amended Complaint                                    Case No. 2:20-cv-06472

Plaintiff Mitrowke has researched hiring a private tutor to teach her child if the schools do not reopen but it is cost-prohibitive for her family.

20.    Plaintiff Adebukola Onibokum is a resident of Santa Clara County, California. He is a neurosurgeon by profession with two young children. His children attend private, parochial school and the school has applied for a waiver from the Governor's order so that the school can provide in-person learning. Plaintiff Onibokum believes that the quality and depth of online learning is of lesser degree and not comparable to an in-person education, and he supports opening California schools. Plaintiff Onibokum's children attended camp this summer and returned much happier as a result of the vital human interaction that has been absent for children during the shutdown.

21.    Plaintiff Brian Hawkins is resident of San Jacinto, Riverside County, California. He is an African-American full-time pastor. He has two children, including a son who has an Individualized Education Program (hereinafter "IEP"). His son has ADHD and cannot learn via an online format. His son has also been deprived of his special aide who normally helps him (in-person) throughout the entire school day. His daughter, usually a talkative and very social young girl, reports that she is "angry" at missed learning opportunities such as "learning to write cursive." As a pastor, Plaintiff Hawkins has counseled many individuals who have been depressed and suicidal as a result of COVID-19.

22.    Defendant Gavin Newsom ("Newsom") is made a party to this Action in his official capacity as the Governor of California. The California Constitution vests the "supreme executive power of the State" in the Governor, who "shall see that the law is faithfully executed." Cal. Const. Art. V, § 1. Governor Newsom signed Executive Order N-60-20 (the "Executive Order") on May 4, 2020. *See, e.g., Ex Parte Young*, 209 U.S. 123 (1908).

///
///

10

First Amended Complaint                          Case No. 2:20-cv-06472

23.     Defendant Xavier Becerra ("Becerra") is made a party to this Action in his official capacity as the Attorney General of California. Under California law, Becerra is the chief law enforcement officer in the State. Cal. Const. Art. V, § 13.

24.     Defendant Sonia Y. Angell, MD, MPH ("Dr. Angell") is made a party to this Action in her official capacity as the Director and State Public Health Officer. Dr. Angell is sued herein in her official capacity to the extent that she is responsible for providing official government guidance to the various industries that are allowed to operate.

25.     Defendant Tony Thurmond ("Thurmond") is made a party to this Action in his official capacity as State Superintendent of Public Instruction and Director of Education. Thurmond is responsible for enforcing education law and regulations in California.

## FACTUAL ALLEGATIONS

26.     On or about March 4, 2020, California Governor Gavin Newsom proclaimed a State of Emergency as a result of the threat of COVID-19.[1]

27.     On or about March 19, 2020, California Governor Newsom issued Executive Order N-33-20 in which he ordered "all residents are directed to immediately heed the current State public health directives."[2]

28.     On or about May 4, 2020, California Governor Newsom issued Executive Order N-60-20 in which he ordered "All residents are directed to continue to obey State public health directives, as made available at https//covid19.ca.gov/stay-home-except-for-essential needs/ and elsewhere as the State Public Health Officer may provide." Ex. 1.

---

[1] Available as of the date of this filing: https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf.
[2] Available as of the date of filing: https://www.gov.ca.gov/wp-content/uploads/2020/03/EO-N-33-20-COVID-19-HEALTH-ORDER-03.19.2020-002.pdf.

11



First Amended Complaint                              Case No. 2:20-cv-06472

29.     On July 17, 2020 Newsom announced a framework to reopening schools.[3]

30.     Under his plan, schools and school districts are allowed to reopen for in-person instruction *only* "if they are located in a local health jurisdiction (LHJ) that has not been on the county monitoring list within the prior 14 days."[4]

31.     California is the only state in the U.S. that is mandating at the state level that school districts not hold in-person classes, rather than leaving that decision to the individual school districts.[5]

32.     California Department of Public Health (CDPH) has provided guidance to similarly situated industries, namely camps[6] and childcare facilities,[7] allowing them to remain open, but schools are subject to more stringent standards that defy reason.[8]

33.     In fact, at the same time that classrooms are being closed for students, these same classrooms are being used to provide child care.[9]

34.     Currently, there are 37 counties on the watch list.[10] A county is put on the watch list if for any one of five benchmarks for three consecutive days. These five

---

[3] Available as of the date of filing: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Schools%20Reopening%20Recommendations.pdf.

[4] Available as of the date of filing: https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20Library/COVID-19/Schools%20Reopening%20Recommendations.pdf.

[5] Available as of the date of filing: https://thehill.com/homenews/state-watch/508105-heres-your-states-plan-for-reopening-schools.

[6] Available as of the date of filing: https://files.covid19.ca.gov/pdf/guidance-daycamps.pdf.

[7] Available as of the date of filing: https://files.covid19.ca.gov/pdf/guidance-childcare--en.pdf.

[8] Available as of the date of filing: https://files.covid19.ca.gov/pdf/guidance-schools.pdf.

[9] Available as of the date of filing: https://apnews.com/53c43bebfcb6c89aadd2511b8ff8c9f9.

[10] As of July 28, 2020, the following counties are on the watchlist: Alameda, Butte, Colusa, Contra Costa, Fresno, Glenn, Imperial, Kern, Kings, Los Angeles, Madera, Marin, Merced, Mono, Monterey, Napa, Orange, Placer, Riverside, Sacramento, San

12

---



First Amended Complaint

benchmarks include: 1) 100 cases per 100,000 people over a two-week period; 2) more than 25 cases per 100,000 people with positive test rates of more than 8%; 3) an increase in the number of patients hospitalized of more than 10% over a three-day average; 4) ICU bed availability below 20%; and 5) ventilator availability below 25%. To get off the watch list, a county must not trigger any of the five thresholds for three consecutive days.[11] However, in order for schools to open, the county must remain off the watch list for 14 days.

35.     There are currently 5.9 million students K-12 in California.[12]

36.     As of July 14, 2020, there are 8,433 Child Care centers opened in the state of California and a total of 24,915 licensed Family Child Care Homes for a total of 33,348 total facilities.[13]

**Table 1: Total Number of Open Child Care Centers and Family Child Care Homes Statewide and by County (Data Retrieved: 7/14/2020)**

| County | Total Number of Open Facilities<br><br>Child Care Centers | Total Number of Open Facilities<br><br>Family Child Care Homes | Total Number of Open Facilities<br><br>All |
|---|---|---|---|
| Statewide | 8,433 | 24,915 | 33,348 |

///

///

///

Benito, San Bernardino, San Diego, San Francisco, San Joaquin, San Luis Obispo, Santa Barbara, Santa Clara, Santa Cruz, Solano, Sonoma, Stanislaus, Sutter, Tulare, Ventura, Yolo, and Yuba. Available as of the date of filing: https://covid19.ca.gov/roadmap-counties/#track-data.
[11] Available as of the date of filing: https://www.sfchronicle.com/bayarea/article/California-s-watch-list-What-it-monitors-and-15430008.php.
[12] Available as of the date of filing: https://lao.ca.gov/Education/EdBudget/Details/331.
[13] Available as of the date of filing: https://cdss.ca.gov/Portals/9/Additional-Resources/Research-and-Data/DSSDS/ChildCare-7-19.pdf.



First Amended Complaint                                              Case No. 2:20-cv-06472

**The U.S. Department of Education and Centers for Disease Control**
**Are Encouraging Schools to Open**

37.     The United States Department of Education spent approximately $8.3 billion on California K-12 schools for the 2019-2020 school year.[14]

38.     During a July 8 briefing conducted by the Vice President and the coronavirus task force, the United States Secretary of Education, Betsy DeVos, stated that "[t]here were a number of schools and districts across the country that did an awesome job of transitioning this spring. And there were a lot in which I and state school leaders were disappointed in that they didn't figure out how to continue to serve their students. Too many of them just gave up. The Center for Reinventing Public Education [CRPE] said that only 10 percent across the board provided any kind of real curriculum and instruction program."[15]

39.     Devos also quoted The American Academy of Pediatrics, "Keeping schools closed 'places children and adolescents at considerable risk of morbidity and, in some cases, mortality.'"  The Pediatrics' guidance concluded that everyone "should start with a goal of having students physically present in school."  "Fully open" and "fully operational" means that students need a full school year or more, and it's expected it will look different depending on where you are."[16] "Ultimately, it's not a matter of 'if' schools should reopen, it's simply a matter of 'how.'  They must fully open, and they must be fully operational."[17]

---

[14] Available as of the date of filing: https://lao.ca.gov/Education/EdBudget/Details/331.
[15] Available as of the date of filing: https://www.whitehouse.gov/briefings-statements/press-briefing-vice-president-pence-members-coronavirus-task-force-july-8-2020/.
[16] *Id*.; full report available as of the date of filing: https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/.
[17] *Id.*

14



First Amended Complaint                                         Case No. 2:20-cv-06472

40.     CRPE found many disparities among schools.[18] In a new report involving a national representative sample of 477 school systems, statistical weights were applied to provide a national representative sample of U.S. school districts. CRPE compared distance learning in districts with different types of communities and different student populations. CRPE found a "sobering story… just one in three districts expect teachers to provide instruction, track student engagement, or monitor academic progress for all students… Far too many districts are leaving learning to chance during the coronavirus closures."[19]

41.     As CRPE noted, "[e]xperience tells us that low expectations for instruction bode poorly for the students who faced the greatest challenges: those in low-income households, those with disabilities, those who speak a language other than English at home."[20]

42.     Although "[t]racking student progress by collecting work for review, assessing students' progress toward academic benchmarks, or grading their work is the best way to gauge if students are continuing to learn in their remote settings"—and may also be the "only way to get a sense of gaps in students' learning that may emerge before the fall"—CRPE "found worrisome trends in the expectations districts set. Just 42 percent expect[ed] teachers to collect student work, grade it, and include it in final course grades for at least some students (typically those in middle and upper grades)."[21]

43.     The CRPE found a "stark" rural-urban divide "in expectations"—"far more so than the gap in instruction between districts with high concentrations of students who qualify for free or reduced-price lunch."[22]

---

[18] Available as of the day of filing: https://www.crpe.org/thelens/too-many-schools-leave-learning-chance-during-pandemic.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*

15



First Amended Complaint

Case No. 2:20-cv-06472

44.     "More affluent school districts [were] more likely to require live video instruction from teachers. While expectations around synchronous, or real-time, teaching are uncommon across the board (expected in 21.8 percent of districts), only 14.5 percent of school districts with the highest concentration of students receiving free or reduced-price lunch expect[ed] teachers to provide live instruction. The most affluent 25 percent of districts" in the CRPE sample were "twice as likely to expect real-time teaching."[23]  In short, school districts with concentrations of students from low-income families woefully failed to provide meaningful instruction once schools closed in the spring.

45.     School closings also disproportionately affects minorities, as the NAACP notes:[24] "For students of color at all levels across the country, school closings create problems even more urgent than the interruption of their educations. Schools also serve as a community nexus for food and housing. Many Black students are eligible for the federal Free or Reduced-Price Lunch Program (FRPL). Fall 2016 data from the National Center on Education Statistics show that for high-poverty schools where more than 75% of students are eligible for FRPL, Black students accounted for 44% of those attending. At schools where 50-75% percent of students are eligible for FRLP, Black students made up 30% of the student population. For students who rely on their schools as a reliable source of daily meals, school closings leave a critical gap."[25]

46.     The CDC explained that "[s]chools play a critical role in supporting the whole child, not just their academic achievement," including the "development of social and emotional skills," and that a safe, connected environment such as school reduces students' depression, anxiety, and thoughts of suicide.[26]

---

[23] *Id.*

[24] Available as of the day of filing: https://naacp.org/coronavirus/coronavirus-impact-on-students-and-education-systems/.

[25] *Id.*

[26] *The Importance of Reopening America's Schools this Fall*, Centers for Disease Control and Prevention (July 23, 2020), *available at*



First Amended Complaint                                    Case No. 2:20-cv-06472

47.     The CDC also noted that "more than 30 million children participate in the National School Lunch Program and nearly 15 million participate in the School Breakfast Program."[27]

### American Academy of Pediatrics Recommends Students Physically Present in Schools

48.     In late June, the American Academy of Pediatrics ("AAP") "strongly" recommended that "the coming school year should start with a goal of having students physically present in school."[28]

49.     The AAP noted the health benefits that would otherwise be lost, such as "child . . . development," "social and emotional skills," "reliable nutrition," physical/speech and mental health therapy," and "opportunities for physical activity."[29]

50.     The AAP also noted that the lack of "in-person learning" could disproportionately affect minorities and those of less socioeconomic means.[30]

51.     The AAP also explained that "[l]enghty time away from school and associated interruption of supportive services often results in isolation, making it difficult for schools to identify and address important learning deficits as well as child and adolescent physical or sexual abuse, substance use, depression, and suicidal ideation."[31]

///

_____

https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/reopening-schools.html.
[27] *Id.*
[28] American Academy of Pediatrics, *COVID-19 Planning Considerations: Guidance for School Reentry*, 3d para. (Last Updated June 25, 2020), https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/clinical-guidance/covid-19-planning-considerations-return-to-in-person-education-in-schools/.
[29] *Id.* at 1st para.
[30] *Id.*
[31] *Id.*



First Amended Complaint                                    Case No. 2:20-cv-06472

### Studies Show that Open Schools Present Minimal Risk

52.     According to California's own published reports, *not a single minor* in the state of California has died as a result of COVID-19.[32]  "No child under age 18 in the state of California has died due to infection from the coronavirus since tracking began on February 1, 2020…[u]nlike the seasonal flu, which kills approximately 200 children per year nationally."[33] This is consistent with national statistics, which indicate that children under 18 account for 0% of nationwide-deaths from COVID-19.

## Total Deaths by Age

| | |
|---|---|
| 0-17 | 0.0% |
| 18-49 | 6.6% |
| 50-64 | 17.1% |
| 65+ | 76.3% |
| Missing | 0.0% |

53.     The CDC reports that children between the ages of 5–17 are hospitalized at a rate of 5.3 per 100,000 compared to a national average of 113.6.[34]

---

[32] Available as of the date of filing: https://update.covid19.ca.gov.

[33] McDonald Decl. in support of Motion for Preliminary Injunction at ¶ 5.

[34] Available as of the date of filing: https://www.cdc.gov/coronavirus/2019-ncov/covid-data/covidview/index.html#hospitalizations



First Amended Complaint

Case No. 2:20-cv-06472



54.      On March 30, 2020, the Australian Research Council released a study that looked at the early data from China, Singapore, South Korea, Japan, and Iran. The study concluded that while "SARS-CoV-2 can cause mild disease in children, the data available to date suggests that children have not played a substantive role in the intra-household transmission of SARS-CoV-2.[35]

55.      On April 3, 2020, the Ministry of Health for British Columbia found that "COVID-19 virus has a very low infection rate in children estimated at 1-5% worldwide."[36]

56.      On April 26, 2020, another Australian study found *no* evidence of children infecting teachers.[37] The study concluded that the "spread of COVID-19 within NSW (New South Wales) schools has been very limited."[38] This study also found that unlike

---

[35] Available as of the date of filing: https://www.medrxiv.org/content/10.1101/2020.03.26.20044826v1.
[36] Available as of the date of filing: http://www.bccdc.ca/Health-Professionals-Site/Documents/Caring-for-children.pdf.
[37] Available as of the date of filing: http://ncirs.org.au/sites/default/files/2020-04/NCIRS%20NSW%20Schools%20COVID_Summary_FINAL%20public_26%20April%202020.pdf, p. 4.
[38] *Id*.

First Amended Complaint                                    Case No. 2:20-cv-06472

other respiratory viruses, children are not the primary drivers of the spread of COVID-19.[39]

57.     On May 18, 2020, during a video conference of ministers of education with the Council of the European Union, it was reported that since the reopening of schools in 22 member states, there had been *no increase* in infections of COVID-19 among students, teachers and parents.[40]

58.     On May 28, 2020, a study was released showing that there was no evidence of secondary transmission of COVID-19 from children attending school in Ireland.[41]

59.     On June 23, 2020, the Institute Pasteur after studying 1,340 people linked to primary schools in France released a study in which they found that infected children did not spread the virus to other children or to teachers or other school staff.[42]

60.     On July 7, 2020, the Public Health Agency of Sweden published a study titled "Covid-19 in schoolchildren".[43] This study found:

      a.   Closing of schools had no measurable effect on the number of cases of COVID-19 among children;

      b.   Children are not a major risk group of the COVID-19 disease and seem to play a less important role from the transmission point of view, although more active surveillance and special studies such as school and household transmission studies are warranted; and

---

[39] *Id.*

[40] Available as of the date of filing: https://www.washingtonexaminer.com/news/22-eu-member-states-have-not-seen-a-spike-in-coronavirus-cases-in-schools-after-reopening.

[41] Available as of the date of filing: https://www.eurosurveillance.org/content/10.2807/1560-7917.ES.2020.25.21.2000903#html_fulltext.

[42] Available as of the date of filing: https://www.pasteur.fr/fr/file/35404/download.

[43] Available as of the date of filing: https://www.folkhalsomyndigheten.se/contentassets/c1b78bffbfde4a7899eb0d8ffdb57b09/covid-19-school-aged-children.pdf.

20



First Amended Complaint                                    Case No. 2:20-cv-06472

c.  The negative effects of closing schools must be weighed against the possible positive indirect effects it might have on the mitigation of the COVID-19 pandemic.

61.   On July 8, 2020, Prevent Epidemics published a report by the former Head of the Centers for Disease Control and Prevention. In this report titled "Reopening America's Schools: A Public Health Approach" they found that the evidence "suggests that children may play a smaller role in transmission of COVID-19 than adults."[44]

62.   On July 15, 2020, a study of 2,000 German school children was released that concluded that schools and young people do not play a significant role in the transmission of the coronavirus.[45] This study found that schools in Germany did not become hotspots after they were reopened.[46]

63.   On July 15, 2020, the National Academies of Sciences, Engineering, and Medicine prepared a report in which they weighed the health risks of reopening K-12 schools against the educational risks of providing no in-person instruction and they came to the conclusion that:

> Districts should weigh the relative health risks of reopening against the educational risks of providing no in-person instruction in Fall 2020. Given the importance of in-person interaction for learning and development, districts should prioritize reopening with an emphasis on providing full-time, in-person instruction in grades K-5 and for students with special needs who would be best served by in-person instruction.[47]

---

[44] Available as of the date of filing: https://preventepidemics.org/wp-content/uploads/2020/07/Reopening-Americas-Schools_07-08-2020-Final.pdf, p. 6.
[45] Available as of the date of filing: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7271745/.
[46] *Id.*
[47] Available on page 75 as of the date of filing: https://www.nap.edu/read/25858/chapter/1.

21



First Amended Complaint

Case No. 2:20-cv-06472

64.     On July 21, 2020, a leading epidemiologist reported to the media that there is *no known case* of a teacher catching coronavirus from pupils.[48]

65.     On July 23, 2020, the CDC updated its report titled The Importance of Reopening America's Schools this Fall.[49] This report found:

> Death rates among school-aged children are much lower than among adults. At the same time, the harms attributed to closed schools on the social, emotional, and behavioral health, economic well-being, and academic achievement of children, in both the short- and long-term, are well-known and significant.

66.     The CDC also published a report on the age distribution of transmission to new cases in South Korea, which found that less than 1% of new transmission detected in the study were attributed to children aged 0 to 10 years; similarly, less than 1% of new transmissions were from children aged 11 to 20 years.

67.     Presently, there are 22 countries that have their schools open without social distancing, mask wearing, and other measures, yet these countries have not experienced an increase in COVID-19 cases or spread of the virus among children.

68.     These countries have also not seen transmission of the virus between children and their parents or elderly grandparents.

69.     Quite the contrary, one July 2020 study from the University of Dresden concluded that, in fact, children appeared to act as a barrier to transmission.

### Studies Show that the Digital Divide Harms Students

70.     A study from Brown University has explained that "there are many reasons to believe the COVID-19 impacts might be larger for children in poverty and children of color," noting (1) the disproportionately higher rate of COVID-19 infections and

---

[48] Available as of the date of filing: https://www.thetimes.co.uk/article/no-known-case-of-teacher-catching-coronavirus-from-pupils-says-scientist-3zk5g2x6z.
[49] Available as of the date of filing: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/reopening-schools.html.

22



First Amended Complaint                                    Case No. 2:20-cv-06472

deaths and worse effect of the economic downturn on African American and Hispanic parents, and (2) the "digital divide in technology and internet access by race/ethnicity and socioeconomic status."[50]

71.     Studies have shown that "Blacks and Latinos are substantially less likely to have a computer at home than are white, non-Latinos," with some estimates showing that "70.4 percent of whites have access to a home computer" while "only 41.3 percent of blacks and 38.8 percent of Latinos have access to a home computer."[51]

72.     This digital divide is supported by other surveys, one of which reported that: (1) 41% of respondents stated that "not having a computer or tablet or enough available devices" was a "top barrier" to distance learning, while only 37% said that their child's school had lent mobile technology devices; and (2) 71% of African American families and 69% of families with a household income of less than $50,000 stated that lending mobile technology devices would be very helpful for families like theirs.[52] This survey comports with the "evidence that, even when teachers are making themselves and their instructional materials available virtually, many students lack the means to access online material from home."[53]

73.     The Brown University study estimated those negative impacts on children to be a loss of 63-68% of the learning gains in reading relative to a typical school year and a loss of 37-50% in learning gains in math.[54]

_____

[50] Kuhfeld *et al.* (May 2020) *Projecting the potential impacts of COVID-19 school closures on academic achievement*, p. 25 Annenberg Institute at Brown University, https://doi.org/10.26300/cdrv-yw05.

[51] Robert W. Fairlie, *Race and the Digital Divide*, UC Santa Cruz: Department of Economics, UCSC, at 2 (2014), available at https://escholarship.org/uc/item/48h8h99w.

[52] The Education Trust-West, *California Parent Poll: COVID-19 and School Closures* (Accessed on June 19, 2020), available at: https://west.edtrust.org/ca-parent-poll-covid-19-and-school-closures/.

[53] Kuhfeld, *Projecting the potential impacts of COVID-19 school closures on academic achievement*, p. 10.

[54] *Id.* p. 23.

23

First Amended Complaint                                    Case No. 2:20-cv-06472

74.     In some grades, students may come back close to a "full year behind in math."[55]

75.     There is also evidence showing that remote learning leads to decreased teacher interaction with students.[56]

76.     Another study showed that that, even for children receiving average-quality online learning in the fall of 2020, students would lose "three to four months of learning" by January 2021.  And the study predicted that Blacks and Latinos would suffer a 15 to 20 percent grater loss in educational gains than other students.[57]

77.     Less than two weeks after the school shutdown on March 16, 2020, the Los Angeles School District officials admitted that 15,000 students were completely unaccounted for and more than 40,000 had not been in daily contact with their teachers.[58]

78.     A study conducted by the Los Angeles Unified School District (LAUSD) found that between March 16 and May 22, 2020, "on an average day only about 36% of middle and high school students participated online," while "[a]bout 25% logged on or viewed work only" "[a]nd about 40% were absent."  The study also found that Black and Latino students showed participation rates between 10 and 20 percentage points lower than white and Asian peers."  And "English learners, students with disabilities,

---

[55] *Id.*

[56] *Id.* at 10 "There are concerning signs that many teachers have had no contact at all with a significant portion of students . . . only 39% of teachers reported interacting with their students at least once a day, and most teacher-student communication occurred over email", and absenteeism.

[57] Emma Dorn, et al., *COVID-19 and student learning in the United States: The hurt could last a lifetime*, McKinsey & Company (June 1, 2020), available at https://www.mckinsey.com/industries/public-sector/our-insights/covid-19-and-student-learning-in-the-united-states-the-hurt-could-last-a-lifetime.

[58] Howard Blume, *15,000 L.A. high school students are AWOL online, 40,000 fail to check in daily amid coronavirus closures*, LOS ANGELES TIMES, (March 30, 2020) Available at: https://www.latimes.com/california/story/2020-03-30/coronavirus-los-angeles-schools-15000-high-school-students-absent.



First Amended Complaint                                    Case No. 2:20-cv-06472

homeless students and those in the foster-care system had lower rates of online participation."[59]

79.     Even among students from families with lower economic means who are provided with tablets and wifi hotspots, it has been reported that parents who are technologically challenged have been unable to help their children get online. Teachers report students who are unable to respond online because they are babysitting their siblings, who are also home from school, while parents work to keep the family housed. Even the most diligent teacher cannot provide the extra attention to a struggling student that he or she would provide in-person, while using only online resources.

**Special Education Students are Disadvantaged by Distance Learning**

80.     Under federal law, students with disabilities are guaranteed a Free, Appropriate Public Education (FAPE), as incorporated through the IDEA ACT 34 C.F.R. § 300.101 and Title III of the Americans with Disabilities Act of 1990 ("ADA"), § 504 of the Rehabilitation Act of 1973.[60]

81.     The federal government allocates approximately $1.2 billion to California for special education each year.[61]

82.     Many parents of special needs children in California have reported that their children received none, or nearly none, of the individualized instruction guaranteed by law when schools closed in the spring. Frustrated instructors simply gave up when faced with technology challenges, while others didn't even try, and many school districts made zero provision for delivering these federally mandated services to children, despite the federal funding the state received that was conditioned upon

---

[59] *Report reveals disparities among Black, Latino LAUSD students in online learning amid COVID-19 pandemic*, ABC 7 Eyewitness News (July 17, 2020), available at https://abc7.com/lausd-los-angeles-unified-school-district-race-disparity-racial-divide/6321930/.
[60] 20 U.S.C.A. § 1412; *see* 42 U.S.C.A. § 12132; *see* 29 USCA § 794.
[61] Available as of the date of filing: https://lao.ca.gov/Publications/Report/4110#Introduction.



First Amended Complaint                              Case No. 2:20-cv-06472

providing these services.  Accordingly, children with disabilities were especially harmed by the school closures during the spring.

83.    Moreover, even if schools were to make better efforts in the fall, many individualized education programs (IEPs) simply *cannot* be implemented in a distance-learning environment.  For example, many IEPs require individualized instruction, such as a one-on-one aide. And not following an IEP can have grave consequences, such as regression.

84.    While not unique to students with disabilities, socialization in schools is critical for special needs children.

85.    The CDC's July 23, 2020, report on the Importance of Reopening America's Schools this Fall found that

> The lack of in-person educational options disproportionately harms low-income and minority children and those living with disabilities. These students are far less likely to have access to private instruction and care and far more likely to rely on key school-supported resources like food programs, special education services, counseling, and after-school programs to meet basic developmental needs.[62]

### Distance-Only Schools Pose Child Safety Concerns

86.    As mandatory reporters, teachers who have daily contact with children are in the best position to notice and report suspected child abuse.

87.    Nationwide, "stay at home" does not mean "safe at home" as a report from RAINN (Rape, Abuse, & Incest National Network) describes. "Many minors are now quarantined at home with their abuser. Meanwhile, these kids are cut off from their safety net — the teachers, coaches, and friends' parents who are most likely to notice and report suspected abuse…. As a result, abuse reports to many state authorities have

---

[62] Available as of the date of filing: https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/reopening-schools.html.



First Amended Complaint                                        Case No. 2:20-cv-06472

declined — not because there is less abuse taking place, but because children have less contact with adults outside the home who could potentially spot and report abuse. Sadly, it is likely that the risk of children being sexually abused will increase as shelter-in-place orders continue — one more tragic consequence of the public health crisis the country currently faces."[63]

88.    The CDC reports that teachers and educational staff report more than one-fifth of all child-abuse cases, that during school closures "there has been a sharp decline in reports of suspected maltreatment," and hospitals have seen an increase in hospitalizations of children suffering from abuse.[64]

89.    Although child abuse reports have declined, hospitals are reporting higher numbers of physically abused children – this indicates that abuse is not being detected in time (i.e., before an abuse incident requiring hospitalization). In San Diego, during the months of April and May, 24 children were treated for abuse symptoms, which is double the normal rate. Other locations have seen an increase, including Jacksonville, Florida (8 abusive head trauma cases in March and April instead of 3) and Fort Worth, Texas (9 severe cases at a hospital since March, when they usually have only 6 in the whole year).

**One California School District's Effort to Prepare to Open**

90.    As an elected member of the Palos Verdes Peninsula Unified School District ("PVPUSD"), which is located in Los Angeles County, plaintiff Brach was active in the process of preparing the district for school reopenings in the fall.

91.    Brach was involved in preparing a "Return to School" survey.

92.    This survey found that over 60% of parents in the district believed that there was not enough face-to-face teaching time during the initial shutdown.

93.    Over 60% of parents also preferred that their children attend school in a normal in-person setting rather than return to the virtual learning program.

---

[63] Available as of the date of filing: https://www.rainn.org/news/first-time-ever-minors-make-half-visitors-national-sexual-assault-hotline.
[64] *The Importance of Reopening America's Schools*, *supra*.



First Amended Complaint                                           Case No. 2:20-cv-06472

94.      Over 60% of the teachers were comfortable with returning to teach school.

95.      The survey also showed that due to financial constraints, if the school did not return to in-person learning, over 7% of parents of TK – 5th grade children and over 19% of parents of children between 6th – 12th grade would have to leave their children home without supervision.

96.      PVPUSD established a reopening committee that included staff, medical professionals and parents.

97.      PVPUSD was prepared to implement screening including providing a digital app so parents could answer questions each morning regarding symptoms, and the school was prepared to take students' temperature to verify the app's data.

98.      PVPUSD also was prepared to implement the following mitigation strategy:

    a.   Staggered arrival times;

    b.   Designated entrance and exit routes;

    c.   Purchase no touch thermometers;

    d.   Procure N95 masks for nurses and cloth masks for students;

    e.   Provide water filling stations to avoid use of drinking fountains;

    f.   Provide grab/go meals for lunch;

    g.   Plexiglas for serving and cashier stations;

    h.   Investigation of HVAC system to support air circulation if windows had to be closed;

    i.   Order signage for directional guides and handwashing reminders;

    j.   Handwashing stations with foot pedal;

    k.   Install touch free sanitizing;

    l.   Institute protocols for high touch areas.

99.      PVPUSD was ready to work with the teachers, parents, and students to provide options. The 60% of teachers and parents who wanted in-person learning could have chosen that option, while the remainder could continue their learning with virtual study.  The Governor's new guidance upended these plans by requiring all schools in the

28



First Amended Complaint

Case No. 2:20-cv-06472

county to close, regardless of the efforts made to reopen safely, and the choices of parents, teachers, and children.

### Newsom's Doomsday Predictions Have Not Proven True

100.     Governor Newsom's rationale for Executive Order N-33-20, his original shelter in place order, was to "bend the curve."[65] He stated that "[i]n some parts of our state, our case rate is doubling every four days," and that "[t]he point of the stay at home order is to make those numbers moot."[66]  The Governor added that one goal was to slowdown transmission enough to reduce the strain it might place on hospital resources.[67]

101.     Governor Newsom cited a model showing that as of March 19, 2020, 56 percent of Californians, or more than 25 million people, could be infected over the next eight weeks.[68]

102.     Several infectious disease experts, including Professor of Epidemiology John P.A. Ioannidis of Stanford University, called this an extreme, worst-case scenario that was unlikely to happen.[69]  They turned out to be correct.

103.     Upon information and belief, another piece of flawed data that drove California's and Santa Clara County's original, onerous shelter-in-place orders was an incorrect assumption that the $R_0$ of COVID-19 was 5.7.

104.     The "R-naught" is the rate at which people can be infected, or more

---

[65] March 19, 2020 press briefing at 35:17-36:00, available as of the date of filing at https://www.youtube.com/watch?v=8OeyeK8-S5o.
[66] *Id.*
[67] *Id.* at 5:42-8:09.
[68] *Id.* at 5:00-6:00.
[69] *Newsom: 56 % of Californians Could Get Coronavirus If Nothing Is Done*, San Francisco Chronicle, March 19, 2020, available as of May 3, 2020 at: https://webcache.googleusercontent.com/search?q=cache:sokxG9_b-2oJ:https://www.sfchronicle.com/health/article/Newsom-56-of-Californians-could-get-coronavirus-15144438.php+&cd=1&hl=en&ct=clnk&gl=us.

29



First Amended Complaint                                    Case No. 2:20-cv-06472

precisely the rate of reproduction of the virus as measured by infected human hosts.[70]

105.     Upon information and belief, part of the data that the Governor depended on for his claim that 25 million Californians would be infected within eight weeks was the initial rate of infection in Wuhan, the originating epicenter of COVID-19, where the numbers apparently showed a $R_0$ of 5.7.[71]

106.     However, scientists now believe that the $R_0$ of COVID-19 without mitigation efforts is approximately 2.2-2.7.[72] With mitigation efforts, the $R_0$ of COVID-19 has been driven down even further.

107.     More egregiously, the COVID-19 death rate projections model on which Governor Newsom relied for implementing a state of emergency and mass quarantine of healthy Californians, turned out to be grossly flawed.[73] California has thus far accounted for five point three percent (5.3%) of the nation's COVID-19 deaths while containing twelve percent (12%) of the nation's populace.[74]

108.     Governor Newsom's inexplicable restrictions on school reopening are not based on any scientific data and are completely arbitrary, especially in light of the fact that California allows camps and childcare facilities to remain open. More fundamentally, the school closing "plan," which is no plan at all, ignores the state's legal duties to California's children.

---

[70] https://www.nytimes.com/2020/04/23/world/europe/coronavirus-R0-explainer.html.

[71] Available as of the date of filing: https://wwwnc.cdc.gov/eid/article/26/7/20-0282_article.

[72] *Id.*

[73] Available as of the date of filing: https://www.statnews.com/2020/04/17/influential-covid-19-model-uses-flawed-methods-shouldnt-guide-policies-critics-say/.

[74] According to the CDC, California has 6,823 of the United States' 128,035 COVID-19 deaths. Available as of the date of filing at https://www.cdc.gov/nchs/nvss/vsrr/covid19/index.htm.  According to the U.S. Census, California has 39,512,223 of the United States' 328,239,523 people. Available as of date of filing at https://www.census.gov/quickfacts/fact/table/CA,US/PST045219.

30

First Amended Complaint                                    Case No. 2:20-cv-06472

# CLAIMS

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Violation of Due Process under the Fourteenth Amendment

### Deprivation of Substantive Due Process

### (By All Plaintiffs Against All Defendants)

109.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein

110.     The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV. In particular, "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720–21 (internal citations and quotation marks omitted). Plaintiffs and their children have a fundamental right to a basic, minimum education.

111.     Defendants have deprived Plaintiffs and their children of this right in violation of the Fourteenth Amendment to the U.S. Constitution, by effectively precluding children from receiving a basic minimum education because (1) many students have no or limited access to the internet; (2) of those who do have digital access their educations will be significantly impaired; and (3) truancy will run rampant.

112.      The U.S. Constitution entitles Plaintiffs to be free from any burden to a fundamental right unless the infringement is narrowly tailored to serve a compelling state interest.

113.     Defendants lack any compelling, or even rational, interest for burdening Plaintiffs' children of their fundamental right to a basic minimum education. The weight of the evidence shows that children's transmission and infection rates cannot justify school closures. Defendants further ignore that the evidence of mortality risk and severe adverse health outcome risk to children from COVID-19 disease is virtually non-

31

1   existent.

2       114.    Risk to teachers may be managed just as risk to other essential workers is

3   managed in California – by offering choices and providing protection. The challenges

4   posed by the situation pale in comparison to the harm being inflicted on California's

5   families through the deprivations of their constitutional rights.

6       115.    Nor are the Defendants' actions narrowly tailored. If children can study

7   and learn in-person, even on a limited basis while in school, but are forced to "learn"

8   through a means in which they realistically cannot access, then the policy is not

9   narrowly tailored. Moreover, as seen elsewhere, many other States have provided

10  options to attend school, including deploying "hybrid" models of mixed virtual and in-

11  person learning to reduce student contact. While remote instruction may play a role in

12  the various counties' approaches, there is no reason to adopt a one-size-fits-all model

13  for the State, and Defendants' insistence on such an approach fails any form of

14  heightened scrutiny.

15      116.    Plaintiffs have no adequate remedy at law and will suffer serious and

16  irreparable harm to their constitutional rights unless Defendants are enjoined from

17  implementing and enforcing the Governor's Order and associated guidance.

18      117.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to

19  declaratory relief and temporary, preliminary, and permanent injunctive relief

20  invalidating and restraining enforcement of the State Order and associated guidance.

21      118.    Plaintiffs found it necessary to engage the services of private counsel to

22  vindicate their rights under the law. Plaintiffs are therefore entitled to an award of

23  attorneys' fees pursuant to 42 U.S.C. § 1988.

24

25  ///

26  ///

27  ///

28  ///



First Amended Complaint                                    Case No. 2:20-cv-06472

**SECOND CLAIM FOR RELIEF**

**42 U.S.C. § 1983 – Violation of the Equal Protection Clause**

**under the Fourteenth Amendment**

**Arbitrary School Closures**

**(By All Plaintiffs Against All Defendants)**

119.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

120.    The equal protection doctrine prohibits "governmental classifications that affect some groups of citizens differently than others." *Engquist v. Or. Dep't. of Agric.*, 553 U.S. 591, 601 (2008) (citations omitted). The touchstone of this analysis is whether a state creates disparity "between classes of individuals whose situations are arguably indistinguishable." *Ross v. Moffitt*, 417 U.S. 600, 609 (1974).

121.    The framework for reopening schools arbitrarily treats Plaintiffs' children (and other minors attending public and private schools) differently from those in nearby school districts; from those in childcare; and from those attending summer camps, even though all such children and their families are similarly situated.

122.    The risk of exposure or transmission within in any particular county is substantially the same whether children are at school, daycare, or at camp. Children at summer camp, daycare, and in school will be in the presence of other children, in an enclosed  or semi-enclosed space, overseen by an older person(s) not comprised of the child's family unit, for an extended period, and industry guidance issued for schools, camps, and daycare, contains the same or essentially the same protocols for wearing face coverings, physically distancing, hygiene, cleaning, arrival/departure procedures, sharing, checking for signs and symptoms and notification procedures if a child or staff member becomes ill.  Yet only schools are subject to the Governor's mandated closure orders.

123.    Defendants' actions arbitrarily restrict access to schools based on the location of the school. Children residing in any particular county, including those

33



counties in which Defendants have forcibly shut down in-person instruction, may still attend private school in nearby counties, despite the state's assignment of differing levels of risk or exposure to the virus.

124.    There is no rational basis—much less any compelling reason—for Defendants' arbitrary treatment of schools, which are vital to children's development but subject to more severe restrictions and potentially outright closure. Moreover, to the extent the state has a compelling interest in ensuring that parents, children, and teachers afraid of contracting COVID-19 are not forced to return to school this fall, less restrictive alternatives to Defendants' closure regime exist, such as requiring schools to *enable* distanced learning over the internet.  Nor is Defendants' overbearing, one-size-fits-all regime narrowly tailored to prevent to the spread of COVID-19 in schools.  As the example from the Palos Verdes Peninsula Unified School District illustrates, there are a number of steps schools can take to protect their students while still providing effective in-person education.

125.    Defendants' intentional, discriminatory, and arbitrary imposition of state-wide restrictions on school reopening violate Plaintiffs' right to equal protection under the law.

126.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their and/or their children's constitutional rights unless Defendants are enjoined from implementing and enforcing the Governor's Order and associated guidance documents which restrict the reopening of schools in a manner that violates the Equal Protection Clause.

127.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Governor's Order and any associated guidance documents.

128.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of

34

attorneys' fees pursuant to 42 U.S.C. § 1988.

## THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983 – Violation of Title VI of Civil Rights Act of 1964

### Disparate Impact on Racial Minorities

### (By Christine Ruiz, Z. R., Brian Hawkins, Marianna Bema, Ashley Ramirez, Tiffany Mitrowke, and Ade Onibokun Against All Defendants)

129.     Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

130.     Federal law conveys to Plaintiffs the right to be free from enforcement of facially discriminatory laws, facially neutral laws adopted with discriminatory intent or purpose, and facially neutral laws causing a disparate impact on racial minorities with regard to federally funded public programs, including California's public schools. 42 U.S.C. 2000d, *et seq.* (Title VI of the Civil Rights Act of 1964); 28 C.F.R. § 42.104(b)(2). Section 1983, in turn, creates a private right of action against the deprivation of such federal rights against officials acting under color of state law, despite there being no private right of action under a disparate impact theory pursuant to Title VI itself. *See* 42 U.S.C. § 1983; *Alexander v. Sandoval*, 532 U.S. 275, 300 (2001) (Stevens, J., dissenting) ("[l]itigants who in the future wish to enforce the Title VI [disparate impact] regulations against state actors in all likelihood must only reference § 1983 to obtain relief.")

131.     Mandatory distance learning has a negative, disparate impact on racial minorities. Distance learning is more difficult for many minority students, who tend to have less access to technology.  Additionally, schools serving primarily minority students have provided demonstrably less effective distance learning than other schools. And the order applies to counties with disproportionately greater minority populations than those not on the county monitoring list.

///

///



First Amended Complaint

Case No. 2:20-cv-06472

132.    Defendants have acted arbitrarily and with deliberate indifference toward the unduly harsh effects their school restrictions have on racial minorities who have less access to technology, are provided less effective distance-learning, and are more heavily impacted by the orders.

133.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights under Title VI and its implementing regulations unless Defendants are enjoined from implementing and enforcing their broad prohibitions on in-person education in California.

134.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Governor's Order.

135.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

### FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – Violation of Federal Disability Rights Statutes;
### Failure to Provide Appropriate and Equal Educational to Disabled Students
### (By Plaintiffs Christine Ruiz, Z. R., Brian Hawkins, Marianna Bema, and Ashley Ramirez against All Defendants)

136.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Complaint as though fully set forth herein.

137.    Federal law provides all disabled children in California the right to a free appropriate public education, individualized education plans conferring educational benefit, appropriate identification and evaluation, and the right to be free from discrimination on the basis of any disability, including through the exclusion from or deprivation of equal access to the educational opportunities. *See* 20 U.S.C. § 1400, *et seq.* (Individuals with Disabilities Education Act ("IDEA")); 42 U.S.C.A. § 12131, *et*



First Amended Complaint                                          Case No. 2:20-cv-06472

*seq.*, (Title II of the Americans with Disabilities Act of 1990 ("ADA")); 29 U.S.C. § 794, *et seq.*, (Section 504 of the Rehabilitation Act of 1973).

138.     Defendants' arbitrarily imposed restrictions on the reopening of schools, including the forced closure of many public and private schools and the imposition of online-only learning, deprives disabled children in California of these rights, which are secured by the above-cited federal laws.

139.     Defendants acted knowingly, recklessly, and with deliberate indifference to the rights of disabled children in California by forcibly preventing most private and public schools in California from providing disabled students with specialized instruction and related services commensurate with the schools' obligations under federal law, as well as from providing disabled students equal access to education as required by federal law.

140.     Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm in the form of the deprivation of educational opportunities, related services, and other educational and non-discrimination rights secured by federal law, unless Defendants are enjoined from implementing and enforcing the school closure.

141.     Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the state orders and any associated guidance.

142.     Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. They are therefore entitled to an award of attorneys' fees pursuant to 42 U.S.C. § 1988.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against Defendants as follows:

- An order and judgment declaring that the Governor's Order and the associated guidance, facially and as-applied to Plaintiffs, violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S.



First Amended Complaint                                    Case No. 2:20-cv-06472

1    Constitution; Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d, *et*

2    *seq.*); the Individuals with Disabilities Education Act (20 U.S.C. § 1400, *et*

3    *seq.*); Title II of the Americans with Disabilities Act of 1990 (42 U.S.C. §

4    12131, *et seq.*); and/or Section 504 of the Rehabilitation Act of 1973 (29

5    U.S.C. § 794, *et seq.*), and that Plaintiffs' children should be allowed in-

6    person instruction without delay;

7    • An order temporarily, preliminarily, and permanently enjoining and

8      prohibiting Defendants from enforcing the State Order or otherwise

9      interfering with Plaintiffs' constitutional rights and federal guarantees;

10   • For attorneys' fees and costs;

11   • Such other and further relief as the Court deems appropriate and just.

12

13   Date: July 29, 2020                    DHILLON LAW GROUP INC.

14

15                              By:   /s/ Harmeet K. Dhillon

16                                    Harmeet K. Dhillon
                                      Mark P. Meuser
17                                    Gregory R. Michael
                                      Michael Yoder (pro hac vice pending)
18

19                                    EIMER STAHL LLP
20                                    Robert Dunn
                                      Ryan J. Walsh (pro hac vice pending)
21                                    John K. Adams (pro hac vice pending)
22                                    Amy C. Miller (pro hac vice pending)

23                                    Attorneys for Plaintiffs

24

25

26

27

28

                                        38



First Amended Complaint                              Case No. 2:20-cv-06472