HARMEET K. DHILLON (SBN: 207873)
harmeet@dhillonlaw.com
MARK P. MEUSER (SBN: 231335)
mmeuser@dhillonlaw.com
MICHAEL YODER (*pro hac vice*)
myoder@dhillonlaw.com
DHILLON LAW GROUP INC.
177 Post Street, Suite 700
San Francisco, California 94108
Telephone: (415) 433-1700
Facsimile: (415) 520-6593

ROBERT DUNN (SBN: 275600)
rdunn@eimerstahl.com
EIMER STAHL LLP
99 South Almaden Blvd., Suite 662
San Jose, CA 95113
(669) 231-8755

RYAN J. WALSH (*pro hac vice*)
rwalsh@eimerstahl.com
JOHN K. ADAMS (*pro hac vice*)
jadams@eimerstahl.com
AMY C. MILLER (*pro hac vice*)
amiller@eimerstahl.com
EIMER STAHL LLP
10 East Doty Street, Suite 800
Madison, WI 53703
(608) 441-5798

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MATTHEW BRACH,** an individual, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>**GAVIN NEWSOM**, in his official capacity as the Governor of California, *et al.*,<br>　　Defendants. | Case Number: 2:20-CV-06472-SVW-AFM<br><br>**PLAINTIFFS' STATEMENT OF GENUINE DISPUTES IN OPPOSITION TO SUA SPONTE GRANT OF SUMMARY JUDGMENT**<br><br>Judge:　　Hon. Stephen V. Wilson<br>Courtroom:　10A |

Pursuant to Federal Rule of Civil Procedure 56(c) and Local Rule 56-2, Plaintiffs submit the following Statement of Genuine Disputes in opposition to this Court's *sua sponte* grant of summary judgment. ECF No. 60.

## STATEMENT OF FACTS

### I.     Whether Plaintiffs Will Receive A Basic Minimum Education Through "Distance Learning" Is a Disputed Fact.

1.     Defendants claim that Plaintiffs will receive a basic minimum education in the 2020–21 school year notwithstanding the July 17th Order and subsequent updates. *See, e.g.*, Maves Decl. (ECF No. 54-4). There is substantial evidence in the record rebutting this contention.

2.     The COVID-19 pandemic has "exacerbated" "disparities in school funding, qualities of school facilities, educational staffing, and resources for enriching curriculum." Wessel Supp. Decl. (ECF No. 54-3) Ex. WW at 1.

3.     "[V]irtual learning models" "widen" "educational disparities" that disproportionately impact "children who are English language learners, children with disabilities, children living in poverty, and children of African American/Black, Latinx/Hispanic, and Native American/Alaska Native origin." Wessel Supp. Decl. (ECF No. 54-3) Ex. WW at 1; Keech Decl. (ECF No. 28-17) ¶ 16; Jeff Barke Decl. (ECF No. 28-10) Ex. 10 at 2.

4.     "The importance of in-person learning is well-documented, and there is already evidence of the negative impacts on children because of school closures in the spring of 2020." Wessel Supp. Decl. (ECF No. 54-3) Ex. WW 3.

5.     In the spring, rates of student participation in virtual learning were low, a number of schools did not expect teachers to engage with students or actively provide instruction, and many students with disabilities did not receive statutorily mandated services. Hamilton Decl. (ECF No. 28-9) ¶ 6; Jeff Barke Decl. (ECF No. 28-10) Ex. 10 at 2; *see, e.g.*, Hawkins Decl. (ECF No. 28-36) ¶¶ 10–11; Mitrowke Decl. (ECF No. 28-34) ¶¶ 3–4; Ramirez Decl. ¶¶ 8–9; Ruiz Decl. (ECF No. 28-31) ¶¶ 4–6, 13, 15–17.

1

6.     As of July 29, 2020, approximately one million students were incapable of participating in virtual learning at all because they lack access to the required technology. Defendants' Request for Judicial Notice (ECF No. 36) Ex. KK at 1.

**II.     Whether the Orders are Appropriately Tailored to Defendants' Asserted Interest in Combatting the Spread of COVID-19 Is A Disputed Fact.**

7.     Defendants assert that the Orders are narrowly tailored because "opening schools for in-person instruction poses a substantial risk to the spread of the [SARS-CoV-2] virus and increased infections among students, teachers, and staff." Watt Supp. Decl. (ECF No. 54-1) ¶ 3. There is substantial evidence in the record rebutting this contention.

8.     Defendants do not cite any medical or scientific evidence that can be interpreted as supporting the conclusion that children are likely to transmit SARS-CoV-2 to adults or that every school located in Tier I counties is incapable of safely providing some form of in-person education. The studies and news articles Defendants cite either do not evaluate the transmission of SARS-CoV-2 from children to adults, or they state that children are unlikely to experience significant illness or transmit SARS-CoV-2 to adults. Watt Decl. (ECF No. 35-1) ¶¶ 26, 37; Watt Supp. Decl. (ECF No. 54-1) ¶¶ 4, 7, Ex. QQ; Wessel Supp. Decl. (ECF No. 54-3) Ex. WW at 3; Defendants' Request for Judicial Notice (ECF No. 36) Ex. L at 4, Ex. M at 1, Ex. W at 1, Ex. Z at 2–4, Ex. AA, Ex. BB, Ex. DD at 3; Bhattacharya Decl. (ECF No. 28-3) ¶¶ 23–30; Bhattacharya Supp. Decl. in support of Mot. for Temp. Restraining Order (ECF No. 52) ¶¶ 3–6.

9.     Children are extremely unlikely to experience severe symptoms or die from COVID-19. Watt Decl. (ECF No. 35-1) ¶ 18; Watt Supp. Decl. (ECF No. 54-1) ¶ 4; Wessel Supp. Decl. (ECF No. 54-3) Ex. WW at 3; Defendants' Request for Judicial Notice (ECF No. 36) Ex. L at 4, Ex. M at 1, Ex. V at 1, DD at 3; Atlas Decl. (ECF No. 28-4) ¶¶ 10–13, 26; Lyons-Weiler Decl. (ECF No. 28-5) ¶ 7. The fatality rate for individuals under age 70 is less than one-tenth of one percent. Atlas Decl. (ECF No.

28-4) ¶ 9. There has been only one juvenile fatality in California related to COVID-19, a teenager with underlying health conditions. Defendants' Request for Judicial Notice (ECF No. 36) Ex. V at 1.

10. The risk of transmission of SARS-CoV-2 from children to adults is low. Watt Supp. Decl. (ECF No. 54-1) ¶ 4; Wessel Supp. Decl. (ECF No. 54-3) Ex. WW at 3; Defendants' Request for Judicial Notice (ECF No. 36) Ex. L at 4, Ex. M at 1; Bhattacharya Decl. (ECF No. 28-3) ¶¶ 22–27; Atlas Decl. (ECF No. 28-4) ¶ 16; Victory Decl. (ECF No. 28-11) ¶ 5; Jeff Barke Decl. (ECF No. 28-10) Ex. 9; Bhattacharya Supp. Decl. in Support of Mot. for Temp. Restraining Order (ECF No. 52) ¶¶ 3–6.

11. Schools can implement measures proven to reduce the risk of transmission of SARS-CoV-2. These measures include physical distancing, use of cloth face coverings, handwashing, and cohorting. Watt Decl. (ECF No. 35-1) ¶¶ 16, 30, 43; Wessel Supp. Decl. (ECF No. 54-3) Ex. WW at 5, Ex. YY at 1–2; Jeff Barke Decl. (ECF No. 28-10) Ex. 9; Kaufman Decl. (ECF No. 28-06) ¶ 16.

12. Around the world, countries have successfully reopened or partially reopened schools for in-person learning without adverse effect. Jeff Barke Decl. (ECF No. 28-10) Ex. 9. Where outbreaks have been tied to schools or childcare programs, those schools failed to implement basic public safety measures such as wearing cloth-masks and ensuring classroom as well-ventilated. Defendants' Request for Judicial Notice (ECF No. 36) Ex. W at 1, Ex. Z at 2.

13. Defendants have permitted childcare centers to operate for months according to guidelines designed to allow them to operate safely in-person. Watt Decl. (ECF No. 35-1) ¶ 20.[1] Schools in California are also permitted to run childcare centers on campus for a fee. Dhillon Decl. (ECF No. 28-2) ¶ 7. These children are supervised *in classrooms* by childcare workers. *Id.*; Ziegler Supp. Decl. (ECF No. 55-6) ¶ 5.

---

[1] "COVID-19 Update Guidance: Child Care Programs and Providers" (July 17, 2020), https://files.covid19.ca.gov/pdf/guidance-childcare--en.pdf.

Statement of Facts                                    Case No. 2:20-CV-06472

**III.    Whether The California Department Of Public Health's Guidance Relating To Cohorts Is Sufficient To Provide The Services Required By The IDEA Is A Disputed Fact**

14.    Defendants contend that the state's new cohorting guidance cures any violation of the IDEA that the Orders might otherwise have caused.  ECF No. 54 at 17; Wessel Supp. Decl. (ECF No. 54-3) Exs. XX, YY.  There is substantial evidence in the record rebutting this contention.

15.    The restrictions in the new cohorting guidance do not permit enough students to participate in in-person education to satisfy the IDEA. The cohorting guidance limiting groups to 16 and to a total of 25% of the building's capacity will not be able to support all students with an IEP along with English language learners, homeless and at-risk youth, and those not participating in distance learning. Wessel Supp. Decl. (ECF No. 54-3) Ex. YY; Reardon Decl. (ECF No. 28-15) ¶ 6; Walker Decl. (ECF No. 28-16) ¶ 4 (around 12% of all students have an IEP); Keech Decl. (ECF No. 28-17) ¶¶ 6–7 (in some schools, one quarter to more than one half of the students are classified as "English Language Learners").

16.    The child find obligation under the IDEA cannot be adequately performed remotely because disabilities are primarily discovered in the classroom and many students are not logging into virtual learning. Victory Decl. (ECF No. 28-11) ¶ 6 ("children's hearing and visions problems are typically identified at school"); Keech Decl. (ECF 28-17) ¶ 15 (less than 10% of children in one school "logged in" for distance learning).

17.    School districts are having difficulty accommodating all of the children with IEPs, English language learners, and other needy children given the cap on persons present on each school campus. Bema Supp. Decl. ¶ 16.

---

4

**IV.    Whether It Is Rational to Use Case Counts and Positivity Rates to Determine the Tier Placement for Each County Is a Disputed Fact.**

18.    Defendants contend that the State has "tailor[ed] and target[ed] its public health measures including at a county-by-county level," and "focus[ed] more restrictive measures in areas that are currently experiencing elevated rates of infection and hospitalization." Watt Decl. (ECF No. 35-1) ¶ 40.  There is substantial evidence in the record rebutting this contention.

19.    There is "no evidence that CDPH has ever calculated the severity of influenza or other respiratory disease by focusing on the positive test results." Kaufman Supp. Decl. (ECF No. 55-3) ¶ 5. Rather, "[d]eath rates and hospitalization by age groups has been the main driver in determining the weekly status of infectious disease within the State of California for decades." *Id.* ¶ 7. "The most reliable metric for determining whether a county is experiencing community spread is hospitalizations, because "unlike the case rate or positivity rate, the number of people hospitalized for COVID-19 is less likely to be influenced by how much testing is occurring." Cicchetti Supp. Decl. (ECF No. 55-4) ¶ 12.

20.    If the state focused on hospitalization rates, almost the entire state would have been off the monitoring list as of August 25, 2020. Cicchetti Supp. Decl. (ECF No. 55-4) ¶ 16. Yet the state's revised "tier" system does not rely on hospitalization data *at all*, and instead relies exclusively on case counts and positivity rates.[2]

21.    "The selected case rate of 100 per 100,000 is a subjective number which offers little to no scientific validity for identifying overall risk to the health of a specific population." Kaufman Supp. Decl. (ECF No. 55-3) ¶ 9.  Moreover, "[b]ecause the majority of people who become infected with COVID-19 never show symptoms and scientifically pose little-to-no risk to the community, using misleading morbidity rates does not assist in accurately ascertaining the true risk of community transmission." *Id.* ¶ 11.

---

[2] *See Blueprint for a Safer Economy*, available at https://covid19.ca.gov/safer-economy/; https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID19CountyMonitoringOverview.aspx.

Statement of Facts                                           Case No. 2:20-CV-06472

1    20.    Defendants' use of positive test results is also irrational because the PCR

2    tests used to determine a county's tier placement is "inconclusive, misleading, and in-

3    accurate." Kaufman Supp. Decl. (ECF No. 55-3) ¶ 12. Individuals can test positive

4    weeks after they have ceased to be infectious. *Id*. ¶ 13.c; *see also* Kaufman Second

5    Supp. Decl. ¶ 8. Many asymptomatic people who test positive are non-infectious and

6    pose no risk to the general public. Kaufman Supp. Decl. (ECF No. 55-3) ¶ 13.d. And

7    some individuals who are positive will take the PCR test multiple times, yet each time

8    they test positive the state logs it as a positive case. *Id.* ¶ 13.a.

9    21.    California's Department of Public Health has recognized that a "negative

10   test should not be required prior to returning to the workplace after documented

11   COVID infection" because "tests can remain positive long after an individual is no

12   longer infectious."  Kaufman Second Supp. Decl. ¶ 10. CDPH thus recommends that

13   "symptom- or protocol-based criteria should be used in determining when an em-

14   ployee is safe to return to the workplace." *Id.* Yet while CDPH does not believe posi-

15   tive tests should be used to keep individuals from working, it is using positive tests to

16   close schools. *Id.* ¶ 11.  This is irrational.

17

18                                     Respectfully submitted,

19   Date: September 15, 2020          DHILLON LAW GROUP INC.

20

21                              By:    /s/ Harmeet K. Dhillon
                                       Harmeet K. Dhillon
22                                     Mark P. Meuser
                                       Michael Yoder
23

24                                     EIMER STAHL LLP
                                       Robert Dunn
25                                     Ryan J. Walsh
                                       John K. Adams
26                                     Amy C. Miller
27                                     Attorneys for Plaintiffs

28

Statement of Facts                                    Case No. 2:20-CV-06472